# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **LEAH J. JARVIS,** | ) | |
| Plaintiff | ) | |
| | ) | Civil Action No. 2:20cv00001 |
| v. | ) | |
| | ) | **REPORT AND** |
| **ANDREW M. SAUL,** | ) | **RECOMMENDATION** |
| **Commissioner of Social Security,** | ) | |
| Defendant | ) | By:  PAMELA MEADE SARGENT |
| | ) | United States Magistrate Judge |

*I.  Background and Standard of Review*

Plaintiff, Leah J. Jarvis, ("Jarvis"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying her claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42  U.S.C. § 423 *et seq.* Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition. Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966).  "'If there is evidence to justify a refusal to direct a verdict were the

case before a jury, then there is "'substantial evidence.'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Jarvis protectively filed her application for DIB on November 10, 2016, alleging disability as of May 24, 2016, based on depression; anxiety; lack of concentration; panic attacks; memory problems; difficulty being alone; acid reflux; irritable bowel syndrome; blockage in neck; Reynaud's syndrome; and anemia. (Record, ("R."), at 28, 196-97, 213, 230.) The claim was denied initially and upon reconsideration. (R. at 112-14, 118-20, 123-26, 128-30.) Jarvis then requested a hearing before an administrative law judge, ("ALJ"). (R. at 133-34.) The ALJ held a hearing on October 29, 2018, at which Jarvis was represented by counsel. (R. at 51-76.)

By decision dated March 15, 2019, the ALJ denied Jarvis's claim. (R. at 28-44.) The ALJ found that Jarvis met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2021. (R. at 30.) The ALJ found that Jarvis had not engaged in substantial gainful activity since May 24, 2016,[1] the alleged onset date. (R. at 30.) The ALJ determined that Jarvis had severe impairments, namely Reynaud's syndrome; irritable bowel syndrome; migraines; anxiety disorder; major depressive disorder; and post-traumatic stress disorder, ("PTSD"), but he found that Jarvis did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 30.) The ALJ found that Jarvis had the residual functional capacity to perform a limited range of simple, light[2] work

---

[1] Therefore, Jarvis must show that she was disabled between May 24, 2016, the alleged onset date, and March 15, 2019, the date of the ALJ's decision, to be eligible for benefits.

[2] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, she

that required the execution of no more than one- or two-step instructions; that required no more than occasional interaction with co-workers and supervisors; that allowed her to work independently and not in tandem with others; that did not require interaction with the public; and that allowed her to be off task less than 10 percent of the workday. (R. at 33.) The ALJ found that Jarvis was unable to perform her past relevant work. (R. at 42.) Based on Jarvis's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of jobs existed in the national economy that Jarvis could perform, including the jobs of a housekeeping cleaner, a clothing bagger and a marker. (R. at 42-43.) Thus, the ALJ concluded that Jarvis was not under a disability as defined by the Act and was not eligible for DIB benefits. (R. at 43-44.) *See* 20 C.F.R. § 404.1520(g) (2020).

After the ALJ issued his decision, Jarvis pursued her administrative appeals, (R. at 188-90), but the Appeals Council denied her request for review.[3] (R. at 1-6.) Jarvis then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2020). This case is before this court on Jarvis's motion for summary judgment filed August 4, 2020, and the Commissioner's motion for summary judgment filed September 3, 2020.

---

also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2020).

[3] Jarvis's attorney submitted a psychological evaluation and medical source statement dated May 2, 2019, from Melinda Fields, Ph.D., to the Appeals Council. (R. at 2.) The Appeals Council found that this evidence did not relate to the period at issue and, therefore, found that it did not affect the ALJ's March 15, 2019, decision. (R. at 2.)

*II. Facts*[4]

Jarvis was born in 1966, (R. at 54, 196), which, at the time of the ALJ's decision, classified her as a "person closely approaching advanced age" under 20 C.F.R. § 404.1563(d). Jarvis has a master's degree in business administration, and she has past work experience as the director for Southwest Virginia Alcohol Safety Action Program. (R. at 54-55, 214.) Jarvis testified that, while working, she experienced daily panic attacks. (R. at 56-57.) She stated that she missed work at least two days a week and left work early two to three days a week due to anxiety and depression. (R. at 56-58.) Jarvis testified that she found dealing with lots of paperwork and irate people to be stressful. (R. at 70.) She stated that "everything about the work environment is just kind of scary now." (R. at 70.) Jarvis reported that she required special reminders to take care of her personal needs, including reminders of doctors' appointments and to take her medication. (R. at 239.) Jarvis reported that she could pay bills, count change and handle a savings and checking account. (R. at 240.) She stated that her hobbies included watching television and sewing. (R. at 241.)

Mark Hileman, a vocational expert, also was present and testified at Jarvis's hearing. (R. at 70-74.) Hileman testified that Jarvis's work encompassed several skilled occupations that were classified as sedentary;[5] however, he stated that these

---

[4] Jarvis's only dispute is with respect to the ALJ's assessment of her mental limitations. (Plaintiff's Memorandum In Support Of Her Motion For Summary Judgment, ("Plaintiff's Brief"), at 4-6.) Therefore, the court will address the facts relevant to Jarvis's mental health.

[5] Sedentary work involves lifting items weighing up to 10 pounds with occasional lifting or carrying of articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. § 404.1567(a) (2020).

were performed by Jarvis at the medium[6] exertion level. (R. at 71.) Hileman testified that a hypothetical individual of Jarvis's age, education and work history, who had the residual functional capacity to perform a limited range of light work; who could understand, remember and carry out simple, one- to two-step instructions; who could perform simple tasks with occasional interaction with co-workers and supervisors; who should work independently and not in tandem with others; and who could not have interaction with the public, could not perform Jarvis's past work. (R. at 71-72.) Hileman found that other work existed in significant numbers that such an individual could perform, including jobs as a housekeeping cleaner, a clothing bagger and a marker. (R. at 72.) He stated that, while it could vary by employer, employees could be off task about 10 percent of the workday and could miss a day of work per month, maybe a day and a half. (R. at 73.) Hileman stated that there would be no jobs available should a hypothetical individual be limited as indicated by the December 8, 2017, assessment of Dr. Jay V. Narola, M.D., a psychiatrist. (R. at 73-74, 1275-77.)

In rendering his decision, the ALJ reviewed medical records from Dr. Andrew Bockner, M.D., a state agency psychiatrist; Daniel Walter, Psy.D., a state agency psychologist; Dr. Ronald S. Smith, M.D., a psychiatrist; Norton Community Hospital; Community Physicians; Martha Rubenstein, Ph.D., a licensed clinical psychologist; Dr. Jay V. Narola, M.D., a psychiatrist; Holston Medical Group; and Dr. Matthew Cusano, M.D. Jarvis's attorney submitted additional medical evidence from Melinda Fields, Ph.D., to the Appeals Council.[7]

---

[6] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can do medium work, she also can do sedentary and light work. *See* 20 C.F.R. § 404.1567(c) (2020).

[7] Since the Appeals Council considered and incorporated this additional evidence into the record in reaching its decision, (R. at 1-6), this court also must take these new findings into account when determining whether substantial evidence supports the ALJ's findings. *See Wilkins*

Jarvis treated with Dr. Matthew Cusano, M.D., from 2013 through 2018 for generalized anxiety disorder with panic attacks and depression. (R. at 317, 331, 353, 363, 370, 380, 389, 399, 416, 436, 449, 457, 462, 473, 479, 492, 655, 704, 1392, 1407.) During this time, Dr. Cusano noted that Jarvis's mood and affect were normal, and her insight and judgment were intact. (R. at 321, 335, 357, 363, 373, 380, 389, 398, 416, 434, 448, 461, 477, 491, 577, 590, 603, 614, 636, 654, 671, 704, 1378, 1392, 1406, 1420, 1433, 1447, 1470, 1483.) Jarvis reported that she was doing well, and her symptoms of anxiety and depression had improved with medication. (R. at 444, 571, 631, 666, 699, 1371, 1413, 1440, 1476.) Jarvis was encouraged to get involved in her community. (R. at 699.)

Dr. Ronald S. Smith, M.D., a psychiatrist, saw Jarvis from December 2015 through March 2016 for her complaints of anxiety and depression, which she related to her job. (R. at 420-21, 554-61.) Dr. Smith diagnosed major depressive disorder, recurrent, and generalized anxiety disorder with panic and obsessive features. (R. at 555-59.) He reported that Jarvis's appearance was normal; she had intact sensorium and memory; she had an anxious and depressed mood and tearful affect; her thought process was linear; and she had normal judgment. (R. at 556-58.)

On January 15, 2016, Jarvis saw Martha Rubenstein, Ph.D., a licensed clinical psychologist, upon referral from Dr. Smith. (R. at 1020-25.) Jarvis reported work stresses; panic episodes; extremely poor sleep; low mood; and crying episodes. (R. at 1020, 1025.) Rubenstein diagnosed adjustment disorder with mixed anxiety and depressed mood. (R. at 1025.) Rubenstein suspected that Jarvis had some elements of perfectionism, suggesting that a diagnosis of generalized

v. Sec'y of Dep't of Health & Human Servs., 953 F.2d 93, 96 (4th Cir. 1991).

anxiety disorder may be more accurate. (R. at 1025.) It was unclear at that time if Jarvis's symptoms were severe enough to warrant a diagnosis of major depressive disorder. (R. at 1025.) Rubenstein saw Jarvis monthly throughout 2016 for complaints of an anxious mood, crying spells, racing thoughts related to her anxiety and poor asleep. (R. at 1026-39.)

On February 28, 2016, Jarvis was admitted to Norton Community Hospital for complaints of chest pain and facial numbness. (R. at 690-95, 781-83.) Jarvis denied depression, and her mood and affect were appropriate. (R. at 693-94.) While it was suspected that Jarvis's anxiety with panic attacks was playing a role in her symptomatology, her psychiatric examination was deemed normal. (R. at 695, 782.) A CT scan and MRI of Jarvis's head were normal. (R. at 690, 793.) An echocardiogram was normal. (R. at 775-76.) She was discharged with a diagnosis of transient ischemic attack, ("TIA"), versus stroke; atypical chest pain; gastroesophageal reflux disease, ("GERD"); and inflammatory bowel disease. (R. at 690.)

On March 3, March 30 and July 5, 2016, Jarvis reported better sleep and less worry, and she denied crying spells since her medications were changed. (R. at 1027-28, 1032, 1034.) In July 2016, Jarvis reported that she recently took a trip to Ohio. (R. at 1034.) Rubenstein noted that Jarvis still had an anxious mood and appropriate affect, but her cognition was normal. (R. at 1034.) She noted Jarvis's condition had improved since her last session. (R. at 1034.)

In August 2016, Jarvis stated that she could not relax because she dwelt on feeling sorry for herself, she missed her mother who died 11 years prior, and she constantly worried. (R. at 1035-36.) Despite these complaints, Jarvis reported that she had passed the pharmacy technician examination and continued to look for

employment. (R. at 1036-37.) On October 4, 2016, after reporting that she was "very scared to go places by [her]self," Jarvis stated that she had applied for jobs and participated in one interview. (R. at 1038.) Again, on December 5, 2016, Jarvis reported that she was applying for work. (R. at 1039.) At that time, Jarvis reported that she was crying a lot; she was having difficulty sleeping; and she had some concentration problems. (R. at 1039.) Rubenstein noted that Jarvis had an anxious and dysthymic mood and intense and tearful affect. (R. at 1039.)

On December 10, 2016, Rubenstein completed a mental assessment, indicating that Jarvis had no limitations in her ability to follow work rules; to relate to co-workers; to deal with the public; to use judgment in public; and to interact with supervisors. (R. at 1014-16.) She found that Jarvis was slightly limited in her ability to understand, remember and carry out simple job instructions; to maintain personal appearance; and to demonstrate reliability. (R. at 1014-15.) Rubenstein opined that Jarvis had a satisfactory ability to function independently; to understand, remember and carry out detailed job instructions; and to relate predictably in social situations. (R. at 1014-15.) She found that Jarvis had serious limitations in her ability to maintain attention and concentration and to understand, remember and carry out complex job instructions. (R. at 1014-15.) Rubenstein found that Jarvis had no useful ability to deal with work stresses and to behave in an emotionally stable manner. (R. at 1014-15.)

On December 21, 2016, Dr. Jay V. Narola, M.D., a psychiatrist, saw Jarvis for her complaints of stress, depression and anxiety. (R. at 1043-46, 1148-49.) Dr. Narola reported that Jarvis was alert and ambulatory with somewhat adequate grooming and hygiene; she tried to be cooperative; she maintained eye contact; her mood was very anxious and depressed; her affect was depressed and worried; and her insight and judgment were adequate. (R. at 1149.) Dr. Narola diagnosed major

depressive disorder, moderate to severe, recurrent type, with paranoid features; and anxiety disorder, not otherwise specified. (R. at 1149.) He assessed Jarvis's then-current Global Assessment of Functioning, ("GAF"),[8] score at 40[9] to 45,[10] with her highest GAF score being 45 to 55[11] within the past year. (R. at 1044.) On December 28, 2016, Jarvis was alert, ambulatory and spoke coherently; her affect was very worried and preoccupied with medication side effect issues; and her attention, concentration, insight and judgment were limited to fair. (R. at 1049.)

Jarvis continued to see Rubenstein throughout 2017 for her complaints of anxiety and difficulty concentrating. (R. at 1040, 1101-06, 1241-48.) During this time, Jarvis reported that she drove herself to the appointment and that she was driving locally on her own; she was searching for employment; she was attending church; she was taking quilting classes; she was traveling; and she went out to eat with friends and family. (R. at 1101, 1103-05, 1241-42.) Rubenstein noted that Jarvis had an anxious and dysthymic mood, an appropriate, intense and tearful affect, and her cognition was normal. (R. at 1040, 1101, 1103, 1105-06, 1241-42, 1244.)

On January 14, 2017, Jarvis reported that her anxiety was improving, but

---

[8] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[9] A GAF score of 31-40 indicates that the individual has "[s]ome impairment in reality testing or communication ... OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood ...." DSM-IV at 32.

[10] A GAF score of 41-50 indicates that the individual has "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning...." DSM-IV at 32.

[11] A GAF score of 51-60 indicates that the individual has "[m]oderate symptoms...  OR moderate difficulty in social, occupational, or school functioning...." DSM-IV at 32.

still not under control. (R. at 1052.) Jarvis was alert, ambulatory and spoke coherently; her affect was less depressed and worried; and her attention, concentration, insight and judgment were getting better. (R. at 1052.) On January 21, 2017, Jarvis reported that she was sleeping well with her medication. (R. at 1053.) Jarvis was alert, ambulatory and spoke coherently; her affect was constricted in range and not overwhelmed; and her insight and judgment were adequate. (R. at 1053.)

On February 2, 2017, Jarvis reported that she had three crying spells since her last visit, and she continued to struggle with tiredness. (R. at 1130.) Jarvis was alert, ambulatory and spoke coherently; her affect was tearful; and her insight and judgment were fair. (R. at 1130.) On February 9, 2017, Jarvis stated that she tolerated Prozac and, although she was still depressed, she was making progress. (R. at 1131.) On February 22, 2017, Dr. Narola reported that Jarvis's affect was less depressed and worried. (R. at 1133.) On February 25, 2017, Jarvis denied having crying spells. (R. at 1134.) Her affect was less depressed and worried, and her insight and judgment were adequate. (R. at 1134.)

On March 16, 2017, Jarvis reported taking her medication as prescribed, that she was still having some depression, but she denied having crying spells. (R. at 1136.) Dr. Narola reported that Jarvis's affect was getting brighter and less depressed. (R. at 1136.) On March 23, 2017, Jarvis reported that her medication was helping her symptoms, and she denied side effects. (R. at 1137.) She reported feeling less depressed and denied crying spells. (R. at 1137.) On April 6, 2017, Jarvis reported that her medication helped her anxiety. (R. at 1139.) Dr. Narola reported that Jarvis was less depressed and worried. (R. at 1139.) On April 11, 2017, Jarvis reported improvement on medication, but she still had some nervousness and anxiety. (R. at 1140.) Jarvis's affect was more relaxed. (R. at

1140.) On April 19, 2017, Dr. Narola reported that Jarvis was less depressed and worried. (R. at 1141.)

On May 2, 2017, Dr. Andrew Bockner, M.D., a state agency psychiatrist, completed a Psychiatric Review Technique form, ("PRTF"), indicating that Jarvis suffered from severe depressive, bipolar and related disorders and anxiety and obsessive-compulsive disorders. (R. at 82-83.) He found that Jarvis had moderate limitations in her ability to understand, remember or apply information; to interact with others; and to concentrate, persist or maintain pace. (R. at 82.) Dr. Bockner found that Jarvis had no limitations on her ability to adapt or manage herself. (R. at 83.)

That same day, Dr. Bockner completed a mental assessment, indicating that Jarvis had moderate limitations in her ability to understand, remember and carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; to work in coordination with or in proximity to others without being distracted by them; to make simple work-related decisions; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; and to get along with co-workers or peers without distracting them or exhibiting behavioral extremes. (R. at 86-88.) Dr. Bockner stated that Jarvis's work-related mental abilities were, otherwise, not significantly limited. (R. at 87-88.) He found that Jarvis could perform simple, unskilled work that required no more than one- and two-step instructions, and he recommended limited interaction with the general public. (R. at 87.)

On May 22, 2017, Jarvis reported attention issues. (R. at 1145.) Dr. Narola reported that Jarvis's affect was less depressed and worried, and her attention, concentration, insight and judgment were somewhat adequate. (R. at 1145.)

On June 5, 2017, Daniel Walter, Psy.D., a state agency psychologist, completed a PRTF, indicating that Jarvis suffered from severe depressive, bipolar and related disorders and anxiety and obsessive-compulsive disorders. (R. at 97-98.) He found that Jarvis had moderate limitations in her ability to understand, remember or apply information; to interact with others; and to concentrate, persist or maintain pace. (R. at 98.) Walter found that Jarvis had no limitations on her ability to adapt or manage herself. (R. at 98.)

That same day, Walter completed a mental assessment, indicating that Jarvis had moderate limitations in her ability to understand, remember and carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; to work in coordination with or in proximity to others without being distracted by them; to make simple work-related decisions; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; and to get along with co-workers or peers without distracting them or exhibiting behavioral extremes. (R. at 102-04.) Walter stated that Jarvis's work-related mental abilities were, otherwise, not significantly limited. (R. at 102-03.) He stated that Jarvis could carry out simple, one- and two-step instructions without additional supervision, and he recommended limited interaction with the general public. (R. at 103.)

On June 9, 2017, Jarvis reported that she was doing better with her medication regimen. (R. at 1273.) On July 12, 2017, Jarvis reported that her anxiety was improving. (R. at 1271.) On September 7 and 12, 2017, Jarvis reported that medication helped her anxiety. (R. at 1260-61.) On September 18, 2017, Jarvis reported that, although she had a crying spell the previous day, her anxiety was "not so bad." (R. at 1259.) On September 30, 2017, Dr. Narola reported that he was writing Jarvis an excuse for jury duty, as she had not developed sufficient coping mechanism and cognitive abilities to serve as a juror. (R. at 1256-57.) On October 14 and 23, 2017, Jarvis reported that her symptoms of anxiety had improved with medication. (R. at 1253-54.) She was not overwhelmed nor overtly depressed. (R. at 1253.)

On December 4, 2017, Jarvis reported that she was still nervous, but did not have panic attacks. (R. at 1250.) Dr. Narola reported that Jarvis was alert and ambulating slowly and not sitting relaxed; her affect was worried, but not overwhelmed; her attention, concentration, insight and judgment in a one-on-one supportive session were somewhat fair, and he noted that it was understandable that Jarvis did not have fair cognitive abilities. (R. at 1250.) Dr. Narola reported that Jarvis needed recommendations repeated, and she appeared to be paying attention "extra hard to grasp it." (R. at 1250.) He reported that Jarvis was psychiatrically disabled. (R. at 1250.)

On December 8, 2017, Dr. Narola completed a mental assessment, indicating that Jarvis had no to slight limitations in her ability to maintain personal appearance. (R. at 1275-77.) He found that Jarvis had slight to satisfactory limitations in her ability to demonstrate reliability. (R. at 1275-76.) Dr. Narola opined that Jarvis had a satisfactory to seriously limited ability to maintain attention and concentration and to understand, remember and carry out simple job

instructions. (R. at 1275-76.) He found that Jarvis had serious limitations in her ability to follow work rules; to relate to co-workers; to deal with the public; to use judgment in public; to interact with supervisors; to deal with work stresses; to function independently; to understand, remember and carry out detailed job instructions; to behave in an emotionally stable manner; and to relate predictably in social situations. (R. at 1275-76.) Dr. Narola found that Jarvis had no useful ability to understand, remember and carry out complex job instructions. (R. at 1275-76.) He found that Jarvis would be absent from work more than two days a month. (R. at 1277.)

Jarvis saw Rubenstein throughout 2018 for her complaints of anxiety. (R. at 1456-66, 1474-75.) Jarvis reported worrying about her husband's health and her grandchildren. (R. at 1460, 1462-64.) On July 3, 2018, Rubenstein reported that Jarvis showed improvement, and, in August 2018, she reported that Jarvis's prognosis was fair and guarded. (R. at 1456-58.) In September and October 2018, Jarvis reported nightmares related to her job and "me too" experiences. (R. at 1474-75.) On October 1, 2018, Rubenstein reported "some improvement," but stated that Jarvis was still "fragile." (R. at 1474.)

On February 27, 2018, Jarvis reported that she was feeling better. (R. at 1359.) She rated her anxiety level was a four on a scale of one to 10. (R. at 1359.) On June 12, 2018, Jarvis reported that her symptoms had improved with medication, and she denied side effects. (R. at 1349.) On June 19, 2018, Jarvis reported that she had attended more meetings with her husband and was able to tolerate more public situations. (R. at 1348.) She reported some anxiety, yet, Dr. Narola reported that her affect was less worried. (R. at 1348.) On June 23, 2018, Jarvis reported the medication adjustment improved her symptoms, as she was not as worried about doing different things in public situations. (R. at 1347.) On July 3,

2018, Jarvis reported doing more social activities. (R. at 1346.) Dr. Narola reported that Jarvis was alert and ambulatory; her affect was worried, but not overwhelmed; and her insight and judgment were fair. (R. at 1346.)

On July 11, 2018, Dr. Narola completed a mental assessment, indicating that Jarvis had slight limitations in her ability to maintain personal appearance and to demonstrate reliability. (R. at 1365-67.) He opined that Jarvis had a satisfactory ability to use judgment in public; to maintain attention and concentration; to understand, remember and carry out simple job instructions; and to behave in an emotionally stable manner. (R. at 1365-66.) Dr. Narola opined that Jarvis had serious limitations in her ability to follow work rules; to relate to co-workers; to deal with the public; to interact with supervisors; to deal with work stresses; to function independently; to understand, remember and carry out detailed job instructions; and to relate predictably in social situations. (R. at 1365-66.) He found that Jarvis had no useful ability to understand, remember and carry out complex job instructions. (R. at 1365-66.) Dr. Narola opined that Jarvis would be absent from work more than two days a month. (R. at 1367.)

On August 6, 2018, Rubenstein completed a mental assessment, indicating that Jarvis had no limitations in her ability to follow work rules; to understand, remember and carry out simple job instructions; and to maintain personal appearance. (R. at 1453-55.) She opined that Jarvis had slight limitations in her ability to use judgment in public; to interact with supervisors; to understand, remember and carry out detailed job instructions; to relate predictably in social situations; and to demonstrate reliability. (R. at 1453-54.) Rubenstein found that Jarvis had a satisfactory ability to relate to co-workers; to function independently; to maintain attention and concentration; to understand, remember and carry out complex job instructions; and to behave in an emotionally stable manner. (R. at

1453-54.) She found that Jarvis had serious limitations in her ability to deal with the public and no useful ability to deal with work stresses. (R. at 1453.) Rubenstein opined that Jarvis would be absent from work more than two days a month. (R. at 1455.)

On July 27, 2018, Jarvis reported attending a support group meeting and found it helpful, except at the end of the session, she began feeling a lump in her throat due to anxiety. (R. at 1500.) On August 7, 2018, Jarvis reported feeling better and denied any side effects from the medication. (R. at 1498.) Jarvis drove herself to the appointment. (R. at 1498.) Dr. Narola noted that Jarvis showed readiness to attend the support group meeting that evening, and she was encouraged to attend the meeting on her own. (R. at 1498.) On September 4, 2018, Jarvis denied feeling depressed. (R. at 1496.) On September 11, 2018, Jarvis reported that she was enjoying attending the support group. (R. at 1495.) Dr. Narola reported that Jarvis's affect was happier, and her insight and judgment were fair. (R. at 1495.) On September 25, 2018, Jarvis reported that she attended a women's church group consisting of 20 women, and she managed to sit through the entire meeting. (R. at 1493.) Dr. Narola suggested that she continue attending various supportive group meetings. (R. at 1493.) On October 2, 2018, Jarvis reported that she continued to have nightmares of her prior job. (R. at 1492.) Jarvis reported that yoga helped her. (R. at 1492.) On October 15, 2018, Jarvis reported that she was doing much better. (R. at 1490.) Dr. Narola noted that Jarvis was making progress. (R. at 1490.)

On May 2, 2019, Melinda M. Fields, Ph.D., a licensed psychologist, evaluated Jarvis. (R. at 9-15.) Fields reported that Jarvis's hygiene and grooming were good; she was pleasant and cooperative; she had adequate eye contact; she spontaneously generated "a great deal of conversation" in a relevant and coherent

fashion; her mood was depressed; she appeared anxious and displayed hand tremors; her affect appeared mood-congruent; her stream of thought appeared organized and logical; she displayed no evidence of thought content impairment or perceptual disturbances; her judgment was impaired; her immediate memory was within normal limits; her recent recall was impaired, as evidenced by her ability to recite one of four words after a delay; her concentration was impaired; her pace was slow; and her gait was within normal limits. (R. at 13.) The Neurobehavioral Cognitive Status Examination, ("NCSE/Cognistat"),[12] was administered, and Jarvis's memory was found to be severely impaired, and her attention and memory registration were moderately impaired. (R. at 13-14.) The Beck Depression Inventory, ("BDI"), suggested clinically significant depressive symptomatology. (R. at 14.) The Beck Anxiety Inventory, ("BAI"), revealed the presence of significant anxiety-related symptoms. (R. at 14.) Fields diagnosed major depressive disorder, recurrent, severe without psychotic features; panic disorder; and generalized anxiety disorder. (R. at 15.)

That same day, Fields completed a mental assessment, indicating that Jarvis had no limitations on her ability to maintain personal appearance. (R. at 17-19.) She found that Jarvis had a satisfactory ability to follow work rules; to interact with supervisors; and to understand, remember and carry out simple job instructions. (R. at 17-18.) Fields opined that Jarvis was seriously limited in her ability to relate to co-workers; to deal with the public; to use judgment in public; to deal with work stresses; to function independently; to maintain attention and concentration; to understand, remember and carry out complex and detailed job instructions; to behave in an emotionally stable manner; to relate predictably in

---

[12] The original Cognistat Paper Test, formerly known as the NCSE is a cognitive test instrument that screens the five major ability areas: language, spatial skills, memory, calculations and reasoning. *See* https://www.cognistat.com/about-original-paper-test (last visited Mar. 26, 2021.)

social situations; and to demonstrate reliability. (R. at 17-18.) She based these findings on Jarvis's complaints of panic attacks, her impaired memory and concentration and major depressive symptoms. (R. at 18-19.) Fields found that Jarvis would be absent from work more than two days a month. (R. at 19.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2020). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a)(4) (2020).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining

-18-

whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Jarvis argues that the ALJ erred by improperly determining her residual functional capacity by failing to give controlling weight to the opinions of her treating psychologist, Rubenstein, and her treating psychiatrist, Dr. Narola, and by giving controlling weight to the opinions of the state agency psychologists. (Plaintiff's Brief at 4-6.) Jarvis contends that the state agency psychologists' assessments were "stale [and] outdated." (Plaintiff's Brief at 6.)

The ALJ found that Jarvis had the residual functional capacity to perform a limited range of simple, light work that required the execution of no more than one- or two-step instructions; that required no more than occasional interaction with co-workers and supervisors; that allowed her to work independently and not in tandem with others; that did not require interaction with the public; and that allowed her to be off task less than 10 percent of the workday. (R. at 33.)

In making this residual functional capacity finding, the ALJ stated that he was giving "little weight" to Dr. Narola's opinion, giving "some weight" to Rubinstein's opinion and giving "significant weight" to the state agency consultants' mental assessments. (R. at 38-40.) While the ALJ, in general, is required to give more weight to opinion evidence from examining versus

nonexamining medical sources, the ALJ is not required to give controlling weight to the opinions of a treating source. *See* 20 C.F.R. § 404.1527(c)(1) (2020). In fact, even an opinion from a treating physician will be accorded significantly less weight if it is "not supported by clinical evidence or if it is inconsistent with other substantial evidence…." *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996). Furthermore, the ALJ is entitled to rely on a nonexamining source's medical opinion where that opinion is supported by the record as a whole. *See Alla Z. v. Berryhill*, 2018 WL 4704060, at *11 (W.D. Va. Sept. 30, 2018); *see also* 20 C.F.R. § 404.1527(c)(3) (2020).

The ALJ gave Dr. Narola's opinions "little weight" because they were inconsistent with the overall medical evidence of record. (R. at 39.) The ALJ noted that Dr. Narola seemed to repeat Jarvis's subjective allegations in a December 2017 progress note where he wrote that "it was understandable that she did not have fair cognitive abilities," while also stating, in the same progress note, that she had fair "attention, concentration, insight, and judgment." (R. at 39, 1250.) Dr. Narola also stated that any change or stress would cause Jarvis to become overwhelmed, yet he recommended that she go on a vacation to Louisiana, which she did, without any significant exacerbation of her symptoms. (R. at 39, 1250-51.) The ALJ found that Dr. Narola's recommendation that Jarvis take a vacation in Louisiana was inconsistent with his opinions of marked limitations. (R. at 39.)

Furthermore, the record shows that Jarvis completed pharmacy technician certification training in August 2016 and reported that she was seeking employment, including secretarial jobs. (R. at 609.) Throughout 2017, Jarvis reported that she drove herself to her appointments and that she was driving locally on her own; she was searching for employment; she was attending church; she was taking quilting classes; she was traveling; and she went out to eat with friends and

family. (R. at 1101, 1103-05, 1241-42.) In February 2018, Jarvis reported that her anxiety level was a four on a scale of one to 10. (R. at 1359.) In June, July, August and September 2018, Jarvis reported that her symptoms had improved; she was attending meetings with her husband; she was able to tolerate public situations; she was doing more social activities; and she was attending support groups, including a women's church group. (R. at 1346-48, 1493, 1495.)

The ALJ observed that Dr. Narola's treatment records showed that Jarvis sometimes seemed anxious or complained of anxiety, but that her anxiety manifested as feeling tense and having the sensation of having a lump in her throat. (R. at 39.) Jarvis reported that the sensation of having a lump in her throat was alleviated with Klonopin. (R. at 1261, 1268-69.) In fact, the record shows that Jarvis routinely reported that her anxiety; depression; sleep; and concentration had improved with medication. (R. at 571, 603, 1027-28, 1032, 1034, 1052-53, 1137, 1139-40, 1253-54, 1260-61, 1273, 1347, 1349, 1371, 1413, 1440.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986).

Jarvis's treating physician, Dr. Cusano, reported in August 2016 and, again throughout 2018, that Jarvis's anxiety was stable, and she was doing well. (R. at 609, 1392, 1407, 1476.) In 2017 and 2018, Dr. Narola reported that Jarvis was less depressed and worried; her affect was brighter, happier and less depressed; and her insight and judgment were adequate to fair. (R. at 1134, 1136, 1139, 1141, 1144, 1495.)

The ALJ noted that he was giving Rubenstein's opinions "some weight," as her medical source statements were "somewhat contradictory" because in 2018, Rubenstein noted Jarvis's improvement, yet, opined that Jarvis had greater

-21-

limitations in many areas. (R. at 40, 1453.) The ALJ further found that Rubenstein's observations were not consistent with the other medical evidence of record. (R. at 40.) As noted above, the medical evidence shows that, in early 2017, Jarvis reported significant improvement. The ALJ noted that the medical evidence did not support Rubenstein's opinion that Jarvis had extreme problems dealing with work stress. (R. at 40.) He noted that Jarvis testified at her hearing that she found dealing with lots of paperwork and irate people to be stressful; therefore, the ALJ limited Jarvis to simple work with only occasional interaction with others. (R. at 40.) The regulations define unskilled work as "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time." 20 C.F.R. § 404.1568(a) (2020); *Menkes v. Astrue,* 262 F. App'x 410, 412 (3d Cir. 2008) ("[P]erforming a 'simple routine task' typically involves low stress level work that does not require maintaining sustained concentration.").

As noted above, Jarvis submitted a May 2, 2019, psychological evaluation, and mental assessment from Fields to the Appeals Council. (R. at 1-6, 9-19.) Since the Appeals Council considered and incorporated this additional evidence into the record in reaching its decision, (R. at 1-6), this court also must take these new findings into account when determining whether substantial evidence supports the ALJ's findings. *See Wilkins,* 953 F.2d at 96. The Appeals Council must consider evidence submitted to it when it is deciding whether to grant review, "'if the additional evidence is (a) new, (b) material, and (c) relates to the period on or before the date of the ALJ's decision.'" *Wilkins*, 953 F.2d at 95-96 (quoting *Williams v. Sullivan*, 905 F.2d 214, 216 (8th Cir. 1990)). Evidence is "new" if it is "not duplicative or cumulative." *Wilkins*, 953 F.2d at 96 (citation omitted). Evidence is "material" if there is a "reasonable possibility that the new evidence would have changed the outcome." *Wilkins*, 953 F.2d at 96 (citing *Borders v. Heckler*, 777 F.2d 954, 956 (4th Cir. 1985)). In this case, the Appeals Council

rejected the evidence because it did "not relate to the period at issue … [and did] not affect the decision about whether [she was] disabled beginning on or before March 15, 2019." (R. at 2.) The Appeals Council instructed Jarvis if she wished it to consider whether she was disabled after March 15, 2019, she could file a new claim. (R. at 2.) Even assuming the evaluation and mental assessment are "new," based on my findings above, I find that they are not material, in that there is not a reasonable possibility they would have changed the ALJ's decision.

The ALJ gave "significant weight" to the state agency psychologists' assessments, who opined that Jarvis could perform simple, unskilled work that required no more than one- to two-step instructions with limited interaction with the general public. (R. at 38-39, 86-88, 102-04.) The ALJ noted that the state agency psychologists' assessments were mostly consistent with the medical record as a whole. (R. at 38.) Under the regulations, the ALJ was entitled to rely on the state agency psychologists' and physicians' assessments. *See* 20 C.F.R. § 404.1513a(3)(b)(1) (2020) ("State agency medical or psychological consultants are highly qualified and experts in Social Security disability evaluation."); *Campbell v. Bowen*, 800 F.2d 1247, 1250 (4th Cir. 1986) (Fourth Circuit cases "clearly contemplate the possibility that [treating physician] opinions may be rejected in particular cases in deference to conflicting opinions of non-treating physicians."); Social Security Ruling, ("S.S.R."), 96-6p, WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings (West Supp. 2013) ("In appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources.").

Jarvis argues that the ALJ should have given the state agency psychologists' assessments less weight because they were "stale [and] outdated," because they did

not have the benefit of reviewing the assessments of her treating psychiatrist and psychologist, Dr. Narola and Rubenstein. (Plaintiff's Brief at 6.) The simple fact that those opinions came later in time than the state agency opinions does not mean that they should be accorded greater weight. As the Third Circuit has noted, "[B]ecause state agency review precedes ALJ review, there is always some time lapse between the consultant's report and the ALJ hearing and decision. The Social Security regulations impose no limit on how much time may pass between a report and the ALJ's decision in reliance on it." *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011); *see also Stricker v. Colvin*, 2016 WL 543216, at *3 (N.D. W. Va. Feb. 10, 2016) ("[A] lapse of time between State agency physician opinions and the ALJ's decision does not render the opinion stale.")

It is apparent from the ALJ's very thorough decision that he carefully evaluated the whole record before him when weighing the opinion evidence, and he ultimately found the state agency medical opinions were consistent with the record as a whole. Here, the opinions of the state agency psychologists that Jarvis could perform simple, unskilled work that required no more than one- to two-step instructions with limited interaction with the general public were consistent with the evidence showing that her symptoms improved with medication. (R. at 38-39, 86-88, 102-04.) Based on this, I find that substantial evidence exists to support the ALJ's weighing of the medical evidence and his finding that Jarvis had the residual functional capacity to perform a limited range of simple, light work.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1.  Substantial evidence exists in the record to support the
    ALJ's weighing of the medical evidence;

2.  Substantial evidence exists in the record to support the
    ALJ's residual functional capacity finding; and

3.  Substantial evidence exists in the record to support the
    Commissioner's finding that Jarvis was not disabled under
    the Act and was not entitled to DIB benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Jarvis's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

## **Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion

of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:    March 26, 2021.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE